# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9684 | **DATE** | DECEMBER 8, 2003 |
| **CASE TITLE** | PAUL FENJE, M.D. v. JAMES FELD, M.D., etc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion to strike [95] is denied. Defendant's motion for leave to file response [118] is granted. Plaintiff's second objections to defendant's evidence and motion to strike the same [108] is granted in part and denied in part. Defendant's motion to strike is granted in part and denied in part. Defendant's motion for summary judgment [90] is granted. Plaintiff's motion for summary judgment [97] is denied. The preliminary injunction entered on May 29, 2002 is dissolved. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff dismissing plaintiff's cause of action with prejudice except that the Count Seven tortious interference claim is dismissed without prejudice for lack of subject matter jurisdiction.

(11) ■ [For further detail see Memorandum Opinion and Order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 9 2003 | |
| | Notified counsel by telephone. | | date docketed | 122 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | Dec. 9, 2003 | |
| cw | courtroom deputy's initials | | date mailed notice | |
| | | | mqm | |
| | | Date/time received in central Clerk's Office | mailing initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAUL FENJE, M.D.,                    )
                                     )
               Plaintiff,            )
                                     )
          v.                         )     No. 01 C 9684
                                     )
JAMES FELD, M.D., in his             )
official capacity and in his         )
individual capacity,                 )
                                     )
               Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Paul Fenje, M.D. claims that he was improperly terminated from the anesthesiology residency program ("the Program") at the University of Illinois at Chicago Medical School (the "University"). Named as the defendant in this case is James Feld, M.D., individually and in his official capacity as a University employee involved in the Program. Pending are both parties' motions for summary judgment and related motions to strike.

Plaintiff's Second Amended Complaint contains seven counts as follows. Except for Count Seven which is brought against defendant Feld in his individual capacity only, each count is brought against Feld in his individual and official capacity, with only injunctive relief being sought in his

122

official capacity; that is, the official capacity claims are not for damages, which would be barred by the Eleventh Amendment. See Fenje v. Board of Governors of the University of Illinois at Chicago Medical School, 2002 WL 959837 *3 (N.D. Ill. May 9, 2002) ("Fenje I").  Count One is a claim pursuant to 42 U.S.C. § 1983 that plaintiff was denied constitutional due process in that he was denied a pretermination hearing.  Count Two is a § 1983 claim that plaintiff was denied due process in that he was denied an adequate posttermination hearing.  Count Three is a § 1983 claim that plaintiff was denied due process in that his posttermination hearing was delayed.  Count Four is a § 1983 claim that the Resident Agreement plaintiff entered into with the University is facially unconstitutional in violation of due process in that it did not expressly provide for a time period in which to hold a termination hearing.  Count Five is a § 1983 due process claim that plaintiff's termination improperly stigmatized him.  Count Six is a § 1983 equal protection "class of one" claim.[1]  Count Seven is a state law claim that defendant Feld tortiously interfered with plaintiff's contract with the University.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the

---

[1]Although the class of one claim contained in the original complaint was dismissed, see Fenje I, 2002 WL 959837 at *6-7, the Second Amended Complaint corrects the deficiency that was the basis for that dismissal.

nonmovant and all factual disputes resolved in favor of the nonmovant. Turner v. J.V.D.B. & Associates, Inc., 330 F.3d 991, 994-95 (7th Cir. 2003); Palmer v. Marion County, 327 F.3d 588, 592 (7th Cir. 2003); Abrams v. Walker, 307 F.3d 650, 653-54 (7th Cir. 2002). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Binz v. Brandt Construction Co., 301 F.3d 529, 532 (7th Cir. 2002); Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. However, the movant must place his arguments within a factual context and a court is not obliged to address unfocused arguments. Anderson v. Cornejo, 225 F. Supp. 2d 834, 845 (N.D. Ill. 2002); Oak Ridge Care Center, Inc. v. Racine County, Wis., 896 F. Supp. 867, 876 (E.D. Wis. 1995); In re ContiCommodity Services, Inc. Securities Litigation, 733 F. Supp. 1555, 1571 (N.D. Ill. 1990), rev'd in part on other grounds sub nom., Brown v. United States, 976 F.2d 1104 (7th Cir. 1992), aff'd in part sub nom., ContiCommodity Services, Inc. v. Ragan, 63 F.3d 438 (5th Cir. 1995), cert. denied, 517 U.S. 1104 (1996). Additionally, it is not sufficient

to show evidence of purportedly disputed facts if those facts are
not plausible

in light of the entire record. See NLFC, Inc. v. Devcom
Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied,
515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481,
485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd.,
844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852
(1988). As the Seventh Circuit has summarized:

> The party moving for summary judgment
> carries the initial burden of production to
> identify "those portions of the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits,
> if any, which it believes demonstrate the absence
> of a genuine issue of material fact." Logan v.
> Commercial Union Ins. Co., 96 F.3d 971, 978 (7th
> Cir. 1996) (citing Celotex Corp. v. Catrett,
> 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
> 265 (1986) (citation and internal quotation
> omitted)). The moving party may discharge this
> burden by "'showing'--that is, pointing out to
> the district court--that there is an absence of
> evidence to support the nonmoving party's case."
> Celotex, 477 U.S. at 325, 106 S. Ct. 2548. Once
> the moving party satisfies this burden, the
> nonmovant must "set forth specific facts showing
> that there is a genuine issue for trial." Fed.
> R. Civ. P. 56(e). "The nonmovant must do
> more, however, than demonstrate some factual
> disagreement between the parties; the issue
> must be 'material.'" Logan, 96 F.3d at 978.
> "Irrelevant or unnecessary facts do not preclude
> summary judgment even when they are in dispute."
> Id. (citation omitted). In determining whether
> the nonmovant has identified a "material" issue
> of fact for trial, we are guided by the
> applicable substantive law; "[o]nly disputes that
> could affect the outcome of the suit under
> governing law will properly preclude the entry of
> summary judgment." McGinn v. Burlington Northern
> R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996)
> (citation omitted). Furthermore, a factual
> dispute is "genuine" for summary judgment

purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" Logan, 96 F.3d at 978 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Outlaw, 259 F.3d at 837.


## I. PLAINTIFF'S EVIDENTIARY OBJECTIONS

The parties and, especially, the attorneys involved in this case have had a particularly contentious relationship. At the deposition of plaintiff, repeated and unnecessary interruptions and objections by plaintiff's counsel, as well as evasive answers by plaintiff himself, resulted in the deposition being continued to another date under the supervision of the magistrate judge assigned to the case. Obstructive conduct has again been exhibited in plaintiff's Local Rule 56.1(b)(3)(A) statement ("Pl. 56.1(b)(3)(A)") responding to defendant's Local Rule 56.1(a)(3) statement ("Def. 56.1(a)(3)"). Plaintiff objects to virtually every assertion contained in defendant's statement and also moves to strike the entire statement. Most of the objections are without merit.

Even if a party fails to authenticate a document properly or to lay a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic. See Erickson v. Baxter Healthcare, Inc., 151 F. Supp. 2d 952, 971 (N.D. Ill. 2001); In re Interstate Steel Setters, Inc., 65 B.R. 312, 316 (Bankr. N.D. Ill. 1986). For example, although a deposition transcript should be certified by the court reporter, objecting that the certification is missing is inappropriate and merely obstructive when the objecting party has no basis for believing the transcript is inauthentic or inaccurate. This is especially true when the certification is not missing. Additionally, such oppositional conduct often does not serve the client because it obscures possible meritorious contentions. Nevertheless, the court will consider the objections that have been raised. However, it is not this bench's practice to strike any motions or any portion of a Rule 56.1 statement. To the extent a factual statement is not adequately supported, it will not be credited. The objections are generally addressed in the Appendix attached to the end of today's Opinion (hereinafter "Appendix" or "App."). The rulings that are recited in the Appendix have been applied in setting forth the facts to be taken as true for purposes of summary judgment.

Plaintiff's second objections to defendant's evidence in support of its motions for summary judgment and motion to strike

the same [108]<sup>2</sup> is a more detailed statement of plaintiff's previously filed motion to strike defendant's Local Rule 56.1(a)(3) statement of material facts [95]. The earlier motion will be denied as moot. Plaintiff's Local Rule 56.1(b)(3)(A) response to defendant's Local Rule 56.1(a)(3) statement of material facts [110] appears to be identical to Document [108] except that Document [110] omits the language requesting that items be struck. Document [110] first sets forth 20 types of objections with supporting case law, then responds paragraph-by-paragraph to defendant's statement of facts while referencing the previously recited objections. This is the set of objections that are considered in the Appendix and the objection numbers referenced therein are those contained in Document 110.<sup>3</sup> While referencing the objections is permissible to avoid repeating the same legal argument over and over, as to the objections raised to a specific paragraph, the specific basis for the objection still must be made sufficiently clear. Defendant is granted leave to

---

<sup>2</sup>The bracketed numbers refer to the docket entry number of the referenced document.

<sup>3</sup>Without the baseless and obstructive objections raised by plaintiff, and with sufficient clarity as to the particular objection raised regarding specific paragraphs of the Local Rule 56.1 statement, this is the type of format preferred by this bench. This bench does not favor motions to strike Rule 56.1 statements or summary judgment exhibits. See Sisto v. Ameritech Sickness & Accident Disability Benefit Plan, 2003 WL 22472022 *2 (N.D. Ill. Oct. 31, 2003); Sphere Drake Ins. Ltd. v. All American Life Insurance Co., ___ F. Supp. 2d ___, 2003 WL 22232840 *3 (N.D. Ill. Sept. 22, 2003); Ogborn v. United Food & Commercial Workers, Local No. 881, 2000 WL 1409855 *2-3 & nn.2-4 (N.D. Ill. Sept. 25, 2000), aff'd, 305 F.3d 763 (7th Cir. 2002).

file its response to the objections [118] and that response has
been considered.

## II. DEFENDANT'S SUMMARY JUDGMENT MOTION

### A. Facts

Resolving all genuine factual disputes and drawing all
reasonable inferences in plaintiff's favor, and resolving
plaintiff's objections in the manner discussed in the Appendix
infra, the facts assumed to be true for purposes of defendant's
motion for summary judgment are as follows.

Plaintiff Paul Fenje, M.D., presently resides in Canada.
In 1994, he graduated from medical school in Ireland. In his
September 29, 2003 affidavit, plaintiff represents that he is
presently licensed to practice medicine in Ireland, which may
constitute licensure for all of the European Union. As of
March 3, 2003, though, he testified that he was not then licensed
to practice in Great Britain or the United States. When asked
why he had no license, he did not mention being licensed in
Ireland and instead responded that he still had to complete Part
Two of the Medical Council Account Exam. It is undisputed that
plaintiff has never been licensed to practice medicine in any
state of the United States. Plaintiff's application to the
Program also indicates that he attended the University of Toronto
where he obtained a B.S. in biochemistry, an M.S. from the
Department of Clinical Pharmacology and Biochemistry, and had
worked toward a Ph.D. in the Department of Pathology.

Defendant James Feld, M.D., is a licensed physician in
the state of Illinois. During times pertinent to this
litigation, defendant served as the chair of an informal
selection committee for the University's Anesthesiology Residency
Training Program (the "Program"). The selection committee makes
recommendations as to admission to the Program with the final
decision being made by Ronald Albrecht, M.D., who, as Director of
the Anesthesiology Department, is technically also the Director
of the Department's Residency Program. However, in the letter to
plaintiff confirming plaintiff's acceptance into the Program,
Feld inserted the title Director of the Program under his
signature. In an affidavit previously submitted in opposition to
plaintiff's motions for preliminary relief, defendant expressly
stated he was Director of the Program. On defendant's summary
judgment motion, it is taken as true that Feld was the de facto
Director of the Program even if he did not have that actual
title.

In 2000, plaintiff submitted an application to the
Program. Just above plaintiff's signature, the application form
includes the following:

> I have read and I understand the instructions for
> the completion of this application. I certify
> that the information submitted on these
> application materials is complete and correct to
> the best of my knowledge. I understand that any
> false or misleading information may disqualify me
> for this position.

Included in plaintiff's application, was a document labeled as a curriculum vitae. Neither the curriculum vitae nor anything else in the application makes any mention of plaintiff having been in a residency program at Ayr Hospital in Scotland in 1999. Plaintiff later submitted a document labeled as work history (Def. Exh. L-37),[4] which refers to being at Ayr Hospital from August 1, 1999 to October 31, 1999. He describes his work for those three months as follows: "Postgraduate training as an SHO/Resident in Emergency Medicine at Ayr General Hospital, Ayr, Scotland, and studied for Canadian Part 2 exam, and continued writing medically oriented book." This document, however, was submitted after plaintiff had accepted the offer of the residency at the University. It was submitted to University staff assisting him with an application for a medical license. It was not made part of the application that was seen by the selection committee or Albrecht. Defendant and Albrecht were unaware of the work history document prior to the initial decision to terminate plaintiff's participation in the Program.

As part of the admission process for the Program, defendant interviewed plaintiff. At the conclusion of the interview, defendant asked plaintiff if there was anything else defendant should know about plaintiff's background including any trouble in any prior training programs. Defendant asked if there

---

[4]Defendant's summary judgment exhibit L, which is contained in defendant's Appendix of Exhibits [92], consists of a number of items identified as Defendant Exhibit No. __. This opinion will refer to these as L-[No.].

were any "skeletons" in plaintiff's "closet." Plaintiff responded there were none.

A few days after the interview, plaintiff sent a May 10, 2000 e-mail to Department of Anesthesiology Administrator Mickey Leavy with a "letter" that he asked to be printed out and forwarded to defendant, which it was. The letter begins, "This is just to put on paper for your convenience about what we last talked about." The letter states in part:

> There are no skeletons of any kind in any of my closets here. I don't smoke, and rarely drink. I have never used any kind of illegal, illicit or recreational drug of any kind. I have never had any kind of confrontation with Police, been arrested or been charged with any type of felony, misdemeanor, or any kind of criminal activity. Even in traffic offenses, I've had one parking ticket and one speeding ticket. In the speeding ticket there was no substance to it but because it was less expensive to simply pay it than take it to court I paid it.

In fact, plaintiff had been dismissed from the Ayr Hospital residency and had retained an attorney who pursued legal proceedings related to this dismissal. The Ayr Hospital legal proceedings continued until at least July 2000. In an August 10, 2000 letter to Albrecht, plaintiff mentioned those proceedings. The only reasonable inference is that plaintiff was well aware in May, June, and July 2000 that a dispute existed regarding his residency at Ayr Hospital.

Sometime prior to June 19, 2000, defendant and the selection committee recommended to Albrecht that plaintiff be admitted into the Program and Albrecht concurred. Sometime prior

to June 19, defendant communicated to plaintiff that he was admitted to the Program and plaintiff indicated his acceptance. Defendant sent plaintiff a June 19, 2000 letter confirming that plaintiff had accepted an offer of a "4-year residency to begin August 1, 2000." Defendant signed the letter as "Director, Anesthesiology Residency Training Program." The letter also indicated that the Graduate Medical School office would contact plaintiff about completing the process.

On July 17, 2000, plaintiff received his Resident Agreement (the "Agreement"), which he signed and returned. On July 24, the Agreement was signed by Albrecht, who was denominated as "Program Director," and, in early August, it was signed by the Associate Dean of Graduate Medical Education. The effective date, as stated on the Agreement, was June 23, 2000. The Agreement is for a one-year residency commencing August 1, 2000. There is a provision for reappointment for further time periods upon the recommendation of the Program Director.

The Agreement includes the following provisions:

4.  *Representations*:  The Resident represents the following:
                        * * *
b)  That he/she possess a valid State of
    Illinois medical license.  Such license will
    be obtained at the Resident's own expense.
    Failure to provide proof of such license as
    of the commencement date of this Agreement
    shall prohibit the resident from providing
    any patient care services subject to any
    additional rights the University may have
    pursuant to Section 10 of this Agreement.
                        * * *
10.  *Termination*:  This Agreement may be
terminated as follows:

> a) by the University in the event the Resident
> fails to obtain the appropriate medical
> license from the State of Illinois within
> thirty (30) days of the commencement date of
> this Agreement. In lieu of termination, the
> University may take such disciplinary action
> against the Resident it deems appropriate
> including suspension without pay from the
> program.
>
> b) by the University upon the failure of the
> Resident to comply with the terms and duties
> described in this agreement.
>
> c) by the Resident upon the University's
> failure to comply with the terms of this
> Agreement provided the Resident furnishes
> thirty (30) day advance written notice to
> the University.
>
> d) by mutual agreement of the parties as
> evidenced in writing.

> 11. *Procedural Right*: In the event this
> Agreement is terminated by the University or the
> Resident is disciplined, the Resident shall have
> such procedural rights as set forth in Exhibit B
> attached hereto. Such rights shall not be
> applicable if said termination is due to
> Resident's failure to obtain or retain an
> appropriate license from the State of Illinois or
> if covered by paragraphs J, K, or L of exhibit B
> attached hereto.

Exhibit B of the Agreement is a document entitled

"Procedural Rights to Suspension/Termination." Under the title,

"*Effective date:* July 1, 1991" is printed. Dr. Feld was not

personally involved in establishing the content of Exhibit B. It

provides in part:

> a. Within fourteen (14) days of written
> notification of his or her suspension or
> termination, a Resident may request an informal
> hearing before a Committee, as more fully
> described below. The Resident's request shall be
> in writing and submitted to the Department Head
> or such individual acting in a similar capacity
> depending on the particular program the Resident
> is enrolled in.

b.   The written notification of suspension and/or termination shall include an explanation from the Department Head (or such individual acting in a similar capacity depending on the particular program the Resident is enrolled in) of the reason(s) for such suspension or termination. The written notification shall also advise the Resident of his or her right to request an informal hearing pursuant to this Exhibit.

c.   [Composition of hearing Committee.]

d.   The Committee shall convene the hearing within ten (10) days of the Resident's written request and shall notify the resident in writing of the date, time, and place for the hearing as soon as reasonably possible, but no less than 72 hours in advance of the hearing.

e.   The Resident and the Department Head or his or her designee or Program Director shall be present at the hearing and shall each present such information or materials (oral or written) as they wish to support their case.  No other representative shall be present during the hearing.  Each shall be permitted to review all materials submitted to the Committee during the hearing.

f.   [Committee decides by majority.]

g.   [Requirement of written decision stating reason.]

h.   A Resident may appeal the Committee's decision to the Associate Dean of Graduate Medical Education within ten (10) days of receipt of the committee's decision.  The Associate Dean shall render his or her decision in writing within a reasonable time, which shall not exceed thirty (30) days.  In the event the Associate Dean intends to reverse the Committee's decision, he or she first must appoint another Committee, in consultation with the Department Head, to discuss the matter.  The Resident may appeal the Associate Dean's decision to the Dean of the College of Medicine within ten (10) days.  The Dean shall render his or her decision within ten (10) days and such decision shall be final.

\* \* \*

l.   The procedural rights provided under this Exhibit do not relate to departmental determinations relating to certification and/or evaluation of the Resident's academic or clinical competence.  Such certification shall be handled according to the standards of the various specialty boards.

After being informed of plaintiff's acceptance in mid-June 2000, Leavy and Marla Dunning of the Office of Graduate Medical Education contacted plaintiff and assisted him with submitting an application for the required medical license.  They do not state when they first contacted him.  Plaintiff first provided a license application on July 12, 2000.  However, that application was incomplete.  Letters and e-mails from plaintiff, which are admissible against plaintiff under Fed. R. Evid. 801(d)(2), show that, in mid-August, plaintiff was still attempting to obtain documentation necessary for his application.  See Def. Exh. L-26, L-29.  It was not until August 30, 2000 that plaintiff had submitted all the documents necessary to obtain a license.  On that date, however, Leavy also learned that plaintiff's acceptance into the Program had been withdrawn so she did not submit the materials.  Even if the license application had been submitted at that time, it still would have taken additional time thereafter to receive the license.  Plaintiff states in an affidavit that the University was at fault for any delays.  See Pl. Sept. 29, 2003 Aff. ¶¶ 37-43.  In his affidavit, though, plaintiff does not refer to any dates nor identify any specific act of a University employee that contributed to the delay.  The conclusory statements in plaintiff's affidavit are not supported by specific facts and therefore do not support a genuine factual dispute as to the University, not he, being at

fault for any delay in submitting his medical license application.

As of late July and early August 2000, Feld was not personally aware that the Agreement had been signed by plaintiff and the University officials. In late July 2000, defendant received an anonymous telephone call suggesting plaintiff had had difficulties during residency training at Ayr Hospital in Scotland. The anonymous caller also suggested contacting attending physician Fiona Gibson and the Medical Director at Ayr Hospital. Defendant thereafter contacted plaintiff, who provided his views on the matter and provided defendant with the names of people that could be contacted at Ayr Hospital. Plaintiff also faxed defendant a letter dated August 1, 2000 in which plaintiff states his position. In the letter, plaintiff mentions a number of his references that should be contacted and also states:

> In retrospect, I had never considered this incident any kind of a closet skeleton and had thought of it as a personality clash of some kind with Dr. Fiona Gibson but why completely eluded me. Dr. Gibson had concluded I had some kind of Psychiatric obsessive trait because I attended the ER department while not working simply because I wanted to learn more. Dr. Gibson also concluded I had been having Epileptic Petit Mal seizures because as I speak, I sometimes pause and ponder the question and my response, and rarely blurt out answers without considering the response. . . .
> I very much hope you do talk to my lawyer in Ayr, Mr. Brian Murphy, . . . .

Def. Exh. L-21. Defendant only contacted Gibson and the Medical Director who told him plaintiff had been a resident, his

competency to deliver patient care had been questioned, and plaintiff's six-month residency had therefore been cut short.

After discussing the matter with Albrecht and other members of the informal selection committee, defendant concluded that plaintiff should not be a resident in the Program. The others agreed as well.[5] Approximately August 4, 2000, defendant telephonically informed plaintiff that a decision had been made to terminate his participation in the Program.[6] Although the Agreement provided that plaintiff's residency began August 1, he had not actually reported for duty yet and had not yet obtained a visa to come to the United States. In a July 26, 2000 e-mail to Leavy, plaintiff had reported he still needed to obtain more documentation for his medical license application, he did not yet

---

[5]Albrecht states in his affidavit (¶ 7) that he made the final decision. However, plaintiff points to a May 14, 2002 affidavit of defendant (¶ 7) from which it can be inferred that defendant himself made the ultimate decision that plaintiff should not be in the Program. Also, defendant's current affidavit (¶ 12) is ambiguous as to who made the final decision. On defendant's summary judgment motion, it is taken as true that, following consultation with the others, defendant personally made the decision that plaintiff should not be in the Program.

[6]Defendant characterizes the termination as the withdrawal of the offer because he contends he would not have been aware of whether plaintiff and University officials had already signed a residency agreement. However, defendant's June 19, 2000 letter confirms plaintiff's prior acceptance and refers to an August 1, 2000 start date. Therefore, it can reasonably be inferred that defendant was aware (or at least believed) that plaintiff's residency had already begun. In any event, under the terms of the Agreement, the residency had begun on August 1, 2000, so preventing plaintiff's further participation in the Program would be a termination regardless of what defendant may have believed plaintiff's status was as of August 4, 2000.

have a visa, and he would not be able to begin on August 1. Def. Exh. L-16. Although plaintiff was orally informed by defendant that his residency was terminated and plaintiff understood that his residency had been terminated as indicated by subsequent communications, see, e.g. Def. Exh. L-25, at the time plaintiff was not provided written notice that his residency was terminated nor was he advised of his contractual right to a hearing.

It is undisputed that defendant's basis for the termination was plaintiff's failure to be candid, honest, and forthcoming about possible problems in his background, especially in light of the post-interview e-mail/letter again emphasizing there were no problems. Whether plaintiff's performance in the Ayr Hospital residency was actually deficient was not a basis for the termination.

After defendant informed plaintiff of the termination, plaintiff sent an August 10, 2000 fax to Albrecht (Def. Exh. L-25) in which plaintiff acknowledges that Feld had ended his participation in the residency Program. Plaintiff mentions the termination related to the Ayr Hospital position, referring to a six-month contract with Ayr Hospital and being terminated after 12 days because Gibson considered him "unsafe." Plaintiff denies Gibson's accusations and mentions that he instituted breach of contract proceedings regarding the Ayr Hospital dismissal. Plaintiff closes the letter as follows:

> In my opinion, Dr. Feld did not carry out as
> complete an investigation into this as he
> indicated initially he would. Dr. Feld did not

> talk to the other Physicians whose names he had
> asked for and received.  Because this will
> significantly affect my career in Anesthesiology,
> I respectfully ask that a complete and sufficient
> inquiry into this be done.  Talking only to the
> one Physician who initiated the accusation and
> the Medical Director who signed the termination
> slip, is insufficient in my opinion.

In an affidavit, plaintiff states:  "Very shortly [after August 4, 2000], I demanded from Drs. Feld and Albrecht that I be given a hearing and an opportunity to be heard regarding my termination from the University's program; they did not provide me with one pursuant to my requests."  Pl. Aug. 27, 2003 Aff. ¶ 17.  Plaintiff does not specify whether these were oral requests or written requests.  He does not provide any details as to the language of these requests.  Perhaps the purported request to Albrecht is meant to refer to the request in the August 10 letter that there be "a complete and sufficient inquiry."  Particularly in light of Feld's and Albrecht's denials that any oral request for a hearing was made to either of them, plaintiff's affidavit is not specific enough to establish that any oral request for a hearing was made in August 2000.

In calendar year 2001, plaintiff applied for medical residencies through the Electronic Residency Application Service ("ERAS").[7]  He did not obtain a resident position through that process nor has he in subsequent years.  The only offer of

_____

[7]In the ERAS application, plaintiff lists the Ayr Hospital residency as being from August 1999 to February 1999 (sic).  As the reason for leaving, he wrote "six month contract breeched and finished."

employment that plaintiff has received since August 2000 was to work for Western Health Care Corporation in Newfoundland, but he could not take that position because he did not have or obtain the necessary medical license. Plaintiff has not had any paying position since August 2000. The only type of medical training plaintiff has participated in since August 2000 was being in the department of family medicine at Royal Jubilee Hospital in October and November 2000 in order to learn psychiatry.

Feld and Albrecht have not told anyone outside the University of plaintiff being terminated from the Program. No employer or other resident program has contacted them for a reference for plaintiff. Plaintiff states in an affidavit that he must explain in employment and residency applications his termination and the gap in his employment and that "friends, family members, and others" know of his termination.[8] Pl. Aug. 27, 2003 Aff. ¶¶ 22-24. Plaintiff, however, does not identify any specific employers or persons with whom he has had such discussions. Moreover, these statements in his affidavit are contradicted by his deposition testimony and other evidence. The 2001 ERAS application makes no mention of plaintiff's residency experience at the University and plaintiff testified at his deposition that he could not recall whether he was interviewed for any resident positions or whether he applied in

---

[8]The only nonhearsay evidence of this would be that plaintiff discussed the matter with his friends, family, and others.

2002 or 2003. He also testified at his deposition that he did not know if he informed any other residency program about his experience at the University. Additionally, he testified that he did not know of anyone outside the University who had been told of his experience with the University. Since the statements in the affidavit contradict plaintiff's deposition testimony and no explanation is provided for the changed testimony, these statements in the affidavit will not be credited. Beckel v. Wal-Mart Associates, Inc., 301 F.3d 621, 623 (7th Cir. 2002); Bahnaman v. Lucent Technologies, Inc., 219 F. Supp. 2d 921, 926 (N.D. Ill. 2002). See also Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806-07 (1999). There is no credible evidence that anyone other than employees of the University and those involved in this litigation are aware that plaintiff was terminated from the Program, let alone the stated reasons for the termination.

Plaintiff provides testimony as to his own belief that his not having been in practice or a training program for a few years and having been terminated from the Program will substantially harm his chances of being admitted into another residency program. Such testimony is not sufficient to show the truth of his belief. Defendant does admit that he would closely scrutinize a residency applicant who had not received medical training for more than one and one-half years. It can be inferred from this that other decisionmakers for residency programs would have similar reservations. For purposes of

defendant's summary judgment motion, it will be assumed to be true that plaintiff's ability to obtain admission into another residency program is now more difficult in light of his not having practiced or been in training (other than for a couple months) during the last few years. There is, however, no competent evidence that that situation or his termination from the Program has actually been the cause of his being denied any employment or training opportunity.

On May 29, 2002, a preliminary injunction was entered against defendant in his official capacity:

> ordering that (1) by no later than May 30, 2002, plaintiff is to be temporarily reinstated into the anesthesiology residency program of the University of Illinois at Chicago Medical School; (2) upon reinstatement, plaintiff shall be under indefinite suspension without compensation, benefits, accrual of seniority, the right to any training, or the authority to treat patients; and (3) this order shall remain in force until final judgment is entered in this case or this case is dismissed

Judgment dated May 28, 2002 [24]. See also Fenje v. Feld, 2002 WL 1160158 *8 (N.D. Ill. May 29, 2002) ("Fenje II"). On plaintiff's motion for preliminary relief, it was found that he had failed to show that he had any more than a limited possibility of success, but that he faced the possibility of losing his U.S. Educational Commission for Foreign Medical Graduates certificate if not reinstated whereas there was no significant harm to the University from a "paper" reinstatement of plaintiff. Balancing the likelihood of success and potential

harms, it was found that reinstatement to suspended status was appropriate relief. See id. at *6-8. Neither party makes any argument that this reinstatement affected any right to notice, a hearing, or reinstatement that plaintiff otherwise had.

Approximately November 1, 2002, plaintiff received a letter signed by Albrecht (Def. Exh. L-36) which the parties agree was the first written notice plaintiff received from the University that his residency had been terminated. The notice also advised plaintiff of his right to request a hearing as to his "status" with the University and the Program. The notice listed three grounds for his termination: (1) providing false and misleading information about past "skeletons," specifically the failure to disclose problems at Ayr Hospital; (2) being ineligible for employment because still lacking a visa and Illinois medical license after August 1, 2000; and (3) being unqualified to provide anesthesiology services to patients.

A hearing was held on March 3, 2003. Present at the hearing were the three members of the hearing panel (David Schwartz, Charles Lurido, and Nancy Burke), Feld, and Fenje. Jose Salazar, who was recording the hearing, was also present. The three panel members were all physicians employed in the Anesthesiology Department. None of them were involved in plaintiff's application process and none had been previously aware that plaintiff had been admitted into the residency Program and then terminated. All three panel members knew Feld from

being in the Anesthesiology Department, but were not social friends of Feld.

At the hearing, plaintiff was not permitted to have his attorney present nor did any attorney represent the University or present charges. Fenje was permitted to present a written and oral opening statement as well as other documentary evidence and his own testimony. Feld spoke in favor of the termination. Neither side was permitted to present any testimony other than that of Fenje and Feld. Fenje and Feld were permitted to question each other, though Fenje did not ask any questions of Feld. Schwartz instructed the parties to submit documentary evidence to the panel and each other prior to the hearing date. No discovery was permitted specifically for the hearing, but, by March 3, 2003, much of the discovery in this court case had been completed.

The hearing panel unanimously upheld the decision to terminate plaintiff's participation in the Program. The decision was based solely on the first ground stated in the November 1, 2002 notice. Schwartz's March 11, 2003 written decision on behalf of the panel states:

> It is the unanimous opinion of the hearing committee that Dr. James Feld acted properly on August 4, 2000 by retracting the offer of a residency position in the Department of Anesthesiology for Dr. Fenje. We find this to be so for the following reasons:
> 1. Dr. Fenje's Curriculum Vitae is deliberately misleading in that it does not include exact dates of attendance for his training and failed to include his leaving Ayr

Hospital after only 12 days of a six month contract.

2. When asked about past experiences at his interview with Dr. Feld, Dr. Fenje did not take this opportunity to correct his omission from his Curriculum Vitae and explain the circumstances of his leaving Ayr Hospital.

The hearing committee therefore finds that Dr. Paul Fenje was justly denied a position as a Resident in the Department of Anesthesiology at the University of Illinois at Chicago and, further, that he should not be given residency status.

Plaintiff points to no evidence from which it could reasonably be inferred that this decision would have been different had the hearing been held closer to the time his residency was terminated.

Plaintiff appealed the panel's decision to Michael Bailie, Vice Dean of the College of Medicine. Prior to reaching a decision, Bailie had oral conversations with plaintiff and defendant. Plaintiff was provided the opportunity to submit an additional written statement but did not. Bailie upheld the decision to terminate plaintiff's participation in the Program. In his June 13, 2003 decision, he explained:

The basis for your rejection as a resident at the University of Illinois College of Medicine Department of Anesthesiology was that you failed to provide disclosure of your tenure at Ayr Hospital in your material submitted to the Department. In addition, when given the opportunity to disclose this information to Dr. Feld during and after your interview, you failed to do so.

In your statement to me, you indicated that you thought the interview had taken place before you went to Ayr Hospital and that explained why you did not have it on your resume. However, the

> interview with Dr. Feld did in fact take place
> well after December 1999.
>      Based upon my findings, I believe that Dr.
> Feld acted appropriately in denying you the
> position.

Def. Exh. L-81.  Again, there is no evidence that Bailie's

decision would have been different had the initial hearing been

held closer in time to plaintiff's actual dismissal.

Plaintiff provides no competent evidence that he suffered

any emotional injury as a result of any delays in providing him

with a hearing.[9]  The only evidence of emotional injury that

plaintiff points to is one sentence of an affidavit.  "The

University's delay in offering me a purported hearing regarding

my termination from the University's program for approximately

two years has led to emotional distress for me, and I am claiming

damages for this in my lawsuit."  Pl. Sept. 29, 2003 Aff. ¶ 44.

> But when the injured party's own testimony is the
> only proof of emotional damages, he must explain
> the circumstances of his injury in reasonable
> detail; he cannot rely on mere conclusory
> statements.  Biggs v. Village of Dupo, 892 F.2d
> 1298, 1304 (7th Cir. 1990).  Thus, we have said
> that bare allegations by a plaintiff that the
> defendant's conduct made him "depressed,"
> "humiliated," or the like are not sufficient to

---

[9]Defendant also contends that plaintiff has waived any
claim for emotional injuries based on his response to an
Interrogatory.  See Def. Exh. J Answer 8.  Additionally,
defendant contends that any present testimony of suffering
emotional injury cannot be credited because it would contradict
plaintiff's deposition testimony where he did not include
emotional injury in response to a question of what harm has
resulted from delays in receiving a hearing.  See Pl. Dep. 55-63.
Since plaintiff does not presently provide competent evidence of
emotional injury, those issues need not be decided.

> establish injury unless the facts underlying the
> case are so inherently degrading that it would be
> reasonable to infer that a person would suffer
> emotional distress from the defendant's action.
> <u>Alston v. King</u>, 231 F.3d 383, 388 (7th Cir.
> 2000); <u>United States v. Balistrieri</u>, 981 F.2d
> 916, 931-32 (7th Cir. 1992).

<u>Denius v. Dunlap</u>, 330 F.3d 919, 929-30 (7th Cir. 2003).
Plaintiff's statement in his affidavit is insufficient to
establish that he suffered any emotional injury caused by delay.

### B. Deprivation of Property Interest Without Due Process

Plaintiff contends he had a property interest in his
residency position that entitled him to a pretermination hearing
or, alternatively, a timely and adequate posttermination hearing.

### 1. Existence of Property Interest

In order to be entitled to the due process protections
raised in Counts One through Four, plaintiff must have had a
protectable property interest in the residency position. <u>See</u>
<u>Omosegbon v. Wells</u>, 335 F.3d 668, 674-75 (7th Cir. 2003). Here,
the Agreement had a provision that, absent agreement of the
parties, plaintiff's residency could only be terminated for
cause. Thus, as long as an enforceable contract existed,
plaintiff would have a property interest in his residency. <u>See</u>
<u>id.</u>; <u>Lalvani v. Cook County, Ill.</u>, 269 F.3d 785, 791 (7th Cir.
2001); <u>Fenje I</u>, 2002 WL 959837 at *6. Defendant contends the
Agreement does not create a property interest because the
contract was contingent.

First, defendant points to § 10(a) of the Agreement which permits the University to terminate the Agreement if a medical license is not obtained within 30 days of the commencement of the Agreement. The medical license, however, is not made a condition precedent to the contract being in force. Instead, the Agreement provides that it was effective June 23, 2000 and that the term of plaintiff's employment began August 1, 2000. Failure to obtain the license is a ground for terminating the Agreement 30 days after the residency begins, not a condition that prevents the Agreement from being enforceable. Such a reading is fully consistent with § 4(b) of the Agreement which provides that failure to have a medical license precludes the resident from performing patient services, not that it prevents the residency from commencing. Moreover, it is not provided that the Agreement automatically terminates after 30 days if the license is not obtained. At the University's option, the Agreement may be either terminated or the University may take disciplinary action, including suspension without pay. Furthermore, plaintiff's residency was not terminated on the ground that he lacked a medical license. Although the lack of a license was mentioned in the November 1, 2002 notice, Feld's decision was based entirely upon the failure to disclose the Ayr Hospital situation, as were the decisions of the hearing panel and Vice Dean Bailie. Section 10(a) of the Agreement did not prevent plaintiff from having a protectable property interest in his residency. Compare Hannon v. Turnage, 892 F.2d 653, 659 (7th Cir.), cert. denied,

498 U.S. 821 (1990) (no property interest came into being because, under applicable federal statute, Veteran Administration's appointment of an unlicensed physician was void ab initio). The failure to obtain a medical license should be viewed as a possible cause for terminating the Agreement, which is consistent with plaintiff's interest in the one-year appointment being a property right.

Defendant's other contention is that no property interest was created because the contract was contingent on the truthfulness of the representations contained therein. Again, this is a cause for termination, not a contingency that prevents a property interest from coming into being. See Hostrop v. Board of Junior College District No. 515, 523 F.2d 569, 574 (7th Cir. 1975), cert. denied, 425 U.S. 963 (1976); Rodney v. Secretary of Army, ___ F. Supp. 2d ___, 2003 WL 22700868 *13 (D.D.C. Nov. 6, 2003).

## 2. Pretermination Hearing

Plaintiff contends that he was entitled to a pretermination hearing. Where a public employee has a property interest in a position, the employee ordinarily will have, absent exigent circumstances, a right to notice and a reasonable opportunity to respond prior to termination. Chaney v. Suburban Bus Division of Regional Transportation Authority, 52 F.3d 623, 628 (7th Cir. 1995); Patrick v. Miller, 953 F.2d 1240, 1245 (10th Cir. 1992). However, due process is a flexible concept. Chaney, 52 F.3d at 628. The procedural due process requirements

applicable to a particular situation are highly fact-specific and therefore depend on the particular situation. Sonnleitner v. York, 304 F.3d 704, 713 (7th Cir. 2002). In determining the process that is due, the three-part Mathews balancing test is applied for both pretermination and posttermination process. Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Sonnleitner, 304 F.3d at 712-13. The three factors that are balanced are: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." Id. at 712 (quoting Gilbert v. Homar, 520 U.S. 924, 932 (1997) (quoting Mathews, 424 U.S. at 335)). Even if it is determined that pretermination process is due, the procedures to be provided may be informal and need not be elaborate. As long as adequate posttermination procedures are available, the pretermination procedures require less. Sonnleitner, 304 F.3d at 711; Head v. Chicago School Reform Bd. of Trustees, 225 F.3d 794, 803-04 (7th Cir. 2000); Alston v. King, 157 F.3d 1113, 1117 (7th Cir. 1998). Ordinarily, "at a minimum: (1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his or her side of the story" is required, as well as an impartial decisionmaker. Head, 225 F.3d at 803-04.

Plaintiff's particular situation is unusual. Ordinarily, a public employee who has a property right in his or her employment is already working in the position at the time of discharge. Here, however, plaintiff had not yet started in the position and had not yet obtained a visa to enter and work in the United States. He had not yet arrived in the city where he was to work. Additionally, he had not yet obtained a medical license necessary to fully perform his duties. These facts cut both ways. On the one hand, plaintiff had less of an interest than an existing employee who suddenly becomes jobless, losing both income and benefits. Plaintiff still had an interest in resolving his situation with the University so that he would know if he must seek other residencies or employment instead, but that would not be quite as strong an interest as some one who was actually employed and being paid and then lost his or her position. On the other hand, the University's interest is also less than the usual situation since it did not have as urgent a need to dismiss plaintiff in that he was not yet performing any duties nor would he be immediately available to perform any duties. Moreover, while the University has a substantial interest in precluding a possibly unqualified resident from providing patient services, particularly in the high-risk medical field of anesthesiology, cf. Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 785 (2d Cir.), cert. denied, 502 U.S. 1013 (1991), here that interest did not bring any urgency to the matter because plaintiff was not yet available, or even

permitted, to provide patient services. Defendant had some time to make a decision about terminating plaintiff before he would actually be reporting for duty. Still, the University instead offered the position to a different applicant, so it did have some interest in quickly resolving plaintiff's status so that it could fill the position if necessary.

As to any risk of error, that was not a factor that called for more extensive procedures. Here, plaintiff did not dispute that he was asked about problems or skeletons nor did he dispute that he did not reveal the dismissal from Ayr Hospital during the oral interview. His application itself showed whether the Ayr Hospital experience had been disclosed in those papers. If the decision to terminate plaintiff's participation had been made based on whether plaintiff actually provided poor patient services at Ayr Hospital, further investigation and pretermination procedures might have helped. However, that was not the basis for the decision. It is undisputed that the only basis for the termination decision was the failure to disclose the residency and quick dismissal at Ayr Hospital, the facts of which were not in dispute. The only real question was whether the failure to disclose was such an indication of dishonesty that plaintiff did not have the appropriate character to participate in the Program and be an anesthesiologist.

Another consideration going to the private interests involved and the appropriateness of pretermination procedures is whether posttermination procedures would also be available, as

well as the nature and timing of such proceedings.  <u>Sonnleitner</u>,
304 F.3d at 713.  Under the terms of Exhibit B of the Agreement,
the resident has 14 days to request a hearing and the hearing is
to be convened within 10 days, though no express deadline exists
for the conclusion of the hearing and issuance of a decision.  As
to plaintiff, the posttermination hearing was not held until more
than two and one-half years after his dismissal.  A delay of that
long is a factor favoring fuller pretermination procedures.  <u>See</u>
<u>id.</u> at 713-14.

It is unnecessary to determine precisely how the above
factors should be balanced.  They ordinarily would call for some
pretermination procedures, but not the fullest possible hearing.
There is, however, another overriding consideration that has not
yet been addressed and which establishes that plaintiff was
entitled to only minimal procedures.  In academic situations, the
Supreme Court has held that dismissal on academic grounds, unlike
dismissal on disciplinary grounds, requires only minimal due
process protections, if any.  <u>Board of Curators of University of</u>
<u>Mo. v. Horowitz</u>, 435 U.S. 78, 85-91 (1978).  No hearing, either
pretermination or posttermination, is required.  <u>Id.</u> at 89-90.
"Academic evaluations of a student, in contrast to disciplinary
determinations, bear little resemblance to the judicial and
administrative fact-finding proceedings to which we have
traditionally attached a full-hearing requirement. . . .  Like
the decision of an individual professor as to the proper grade
for a student in his course, the determination whether to dismiss

a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." Id. The reluctance to interfere with the academic process is greater the higher the level of education. Id. at 90; Shaboon v. Duncan, 252 F.3d 722, 730 (5th Cir. 2001).

A medical residency is a hybrid position in which the resident is both a student and an employee. However, it is primarily a learning position for which the limited due process rights afforded an academic decision about a student apply. Shaboon, 252 F.3d at 729-32; Ezekwo, 940 F.2d at 784-85; Davis v. Mann, 882 F.2d 967, 974 (5th Cir. 1989). The Supreme Court was clear that no hearing is required regarding academic decisions. Horowitz, 435 U.S. at 90; Shaboon, 252 F.3d at 730; Ezekwo, 940 F.2d at 785; Davis, 882 F.2d at 975. The Supreme Court did not make clear what minimal procedures are required. As to medical residencies, case law holds that notice of the grounds for the decision and an opportunity to respond is sufficient. Shaboon, 252 F.3d at 730; Ezekwo, 940 F.2d at 785; Davis, 882 F.2d at 975.

Academic grounds for dismissal from a residency program include reasons that go to the resident's fitness to perform as a doctor. Shaboon, 252 F.3d at 731. Issues as to having the proper character to be a doctor are academic grounds. Cf. Horowitz, 435 U.S. 91 at n.6 ("Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the

student's ability to take a case history or diagnose an illness."). The determination that plaintiff lacked the candor or honest character necessary to be a resident and anesthesiologist was a dismissal based on academic grounds, not a disciplinary decision.

Here, prior to his termination, plaintiff was given notice of the potential grounds for his dismissal and an opportunity to present his response and attempt to convince Feld not to dismiss him. That was sufficient process in plaintiff's situation. Additionally, there is no contention that, as of the time of the pretermination process, defendant was not an impartial decisionmaker. In any event, impartiality is presumed and plaintiff has not provided any basis for overcoming that presumption. See Head, 225 F.3d at 803; Bakalis v. Golembeski, 35 F.3d 318, 325-26 (7th Cir. 1994); Alexander v. Board of Education of Indian Prairie School District No. 204, 1998 WL 699020 *9 (N.D. Ill. Oct. 5, 1998). See also Ryan v. Illinois Department of Children & Family Services, 185 F.3d 751, 762 (7th Cir. 1999). Plaintiff received adequate pretermination process.

Count One will be dismissed.

### 3. Posttermination Hearing

Plaintiff's claims concerning the denial of a timely posttermination hearing fail for a number of reasons.

As was already discussed in § II(B)(2) supra regarding pretermination process, plaintiff was entitled to only limited process and was not entitled to a formal hearing. The

pretermination process that was provided was sufficient to satisfy due process. In any event, plaintiff was also provided with a formal hearing which more than satisfied the process to which he was entitled. To the extent plaintiff was constitutionally entitled to any further process following defendant's pretermination decision, plaintiff would be entitled to an impartial decisionmaker. Although plaintiff contends the hearing panel was not impartial, he fails to provide evidence to overcome the presumption of impartiality. Cf. Head, 225 F.3d at 803; Ryan, 185 F.3d at 762.

Plaintiff contends that a due process violation occurs where a public entity violates its own rules and procedures, apparently contending the procedural requirements of Exhibit B of the Agreement were not followed. Plaintiff does not identify what procedure was violated,[10] but, even assuming one of the procedures was not followed, this contention is without merit. A procedure required by contract, statute, or regulation does not create a constitutionally protected right nor does violation of a

_____

[10]Plaintiff may be contending the delay in providing the notice of termination violated the procedural provisions of Exhibit B. That, however, is not true. The body of the Agreement does not require written notice of termination. See Agreement § 10(b). Exhibit B does not expressly require written notification of termination; it only sets the time for the resident's request for a hearing based on when written notice is provided. A resident could request a hearing prior to written notice, but no later than 14 days after written notice. But even if Exhibit B is read as implicitly requiring written notice of a termination, it does not set a deadline for providing written notice. The University did eventually provide written notice.

contract, statute, or regulation, by itself, constitute a violation of due process. Horowitz, 435 U.S. at 92 n.8; Hickey v. O'Bannon, 287 F.3d 656, 658 (7th Cir. 2002); Fuller v. Dillon, 236 F.3d 876, 880 (7th Cir.), cert. denied, 532 U.S. 1072 (2001); Campbell v. City of Champaign, 940 F.2d 1111, 1113 (7th Cir. 1991); Webb v. Board of Trustees of Ball State University, 2002 WL 31242240 *5 (S.D. Ind. July 18, 2002); Kelm v. Arlington Heights Park District, 1999 WL 753930 *6 (N.D. Ill. Sept. 15, 1999).

Even if this were the usual public employment situation where plaintiff would have been entitled to a hearing on his termination, the hearing he was provided complied with those due process rules. Plaintiff was provided notice of the possible grounds for his termination. The University was required to provide copies of the documentary evidence it was presenting and plaintiff was aware of the only live witness other than himself, Feld. Plaintiff was permitted to provide both a written and oral opening statement. He was allowed to present his own documentary evidence and his own testimony, and, although he did not avail himself of the opportunity, he would have been permitted to question Feld. Plaintiff was also permitted to present argument on his behalf. As previously set forth, the hearing panel was impartial. Additionally, the panel set forth in writing the reasons for its decision.

The purported hearing deficiencies raised by plaintiff are not constitutionally required in a termination hearing for a

public employee.[11]  There is no constitutional right to have
counsel present at such hearings.  See Panozzo v. Rhoads,
905 F.2d 135, 139-40 (7th Cir. 1990); Kramarski v. Village of
Orland Park, 2002 WL 1827637 *13 (N.D. Ill. Aug. 9, 2002).  There
is no constitutional right to confront witnesses or present live
witnesses at such hearings.  See Staples v. City of Milwaukee,
142 F.3d 383, 387 (7th Cir. 1998); Moses v. City of Evanston,
1995 WL 625431 *3 (N.D. Ill. Oct. 23, 1995), aff'd by unpublished
order, 97 F.3d 1454 (7th Cir. 1996), cert. denied, 519 U.S. 1117
(1997); Hubbard v. Village of Streamwood, 1995 WL 151830 *3 (N.D.
Ill. April 3, 1995); Moscowitz v. Brown, 850 F. Supp. 1185, 1195
(S.D.N.Y. 1994).  Due process does not require that witness
statements be provided prior to the hearing or that the
opportunity for discovery be provided prior to the hearing.  See
Swank v. Smart, 898 F.2d 1247, 1254-55 (7th Cir.), cert. denied,
498 U.S. 853 (1990); Moscowitz, 850 F. Supp. at 1195; Peterson v.
Unified School District No. 418, 724 F. Supp. 829, 833-34 (D.
Kan. 1989).  It is sufficient that plaintiff was aware of all the
evidence that was provided to the hearing panel and had the
opportunity to rebut it.  See Swank, 898 F.2d at 1254-55.  There
is also no constitutional requirement that the hearing comport
with rules of evidence.  Amundsen v. Chicago Park District,

_____

[11]Although a number of the cases cited below involved
pretermination hearings, they were situations in which the public
employee was provided the fullest hearing she or he would receive
prior to termination.  They are not situations like the present
one where the employee was provided with lesser procedures prior
to termination and fuller procedures after termination.

218 F.3d 712, 717 (7th Cir. 2000). Lastly, termination procedures do not violate due process because the decisionmaker is not empowered to award monetary damages. See Schacht v. Wisconsin Department of Corrections, 175 F.3d 497, 503 (7th Cir. 1999).

Plaintiff's other contention is that the delay in providing plaintiff written notice and eventually a hearing is a violation of due process. It has previously been held that the pretermination process provided to plaintiff was all that the Constitution required. Therefore, any delay in providing a further hearing would not violate due process. If, however, plaintiff was constitutionally entitled to a posttermination proceeding of some type as well, it would be possible that the two and one-half year delay in providing a posttermination proceeding would itself be a due process violation. See De Vito v. Chicago Park District, 972 F.2d 851, 855-58 (7th Cir. 1992).

In determining whether such a delay would have been a violation of due process, the factors set forth in FDIC v. Mallen, 486 U.S. 230, 242 (1988), would be applied. De Vito, 972 F.2d at 855.

> In determining how long a delay is justified in affording a post-suspension hearing and decision, it is important to examine the importance of the private interest and the harm to the interest occasioned by the delay; the justification offered by the government for the delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been erroneous.

Id. (quoting Mallen, 486 U.S. at 242).

Here, plaintiff had a significant interest in resolving his residency status and it was possible, though not necessarily likely, that the pretermination decision would be overturned. Plaintiff had an interest in quickly resolving the situation because substantial delay in his being reinstated may have allowed his medical skills to become stale such that, by March 2003, he no longer had the ability or qualifications to begin a residency even if his dismissal had been overturned. Two and one-half years was too long to wait. Cf. Sonnleitner, 304 F.3d at 714. The question exists, though, as to whose fault was the delay. If the delay was largely attributable to plaintiff, see Yorktown Medical Laboratory, Inc. v. Perales, 948 F.2d 84, 90 (2d Cir. 1991), or the University's delay was otherwise justified, then there could be no due process violation resulting from the delay.

Although plaintiff was not promptly provided with written notice of his termination, he was nevertheless entitled to request a hearing any time after his residency was terminated, but no later than 14 days after receiving written notice. The only evidence that plaintiff presents of having requested a hearing prior to November 2002 is the August 10, 2000 fax to Albrecht in which plaintiff states in part: "I respectfully ask that a complete and sufficient inquiry into this be done." This is not a clear request for a hearing. An "inquiry" would be an

investigation by Albrecht or others at the University. That is
not the same as a hearing. Moreover, there is no evidence that
plaintiff followed up on the request by inquiring when a hearing
would be scheduled. This should not be understood as a request
for a hearing. There is no evidence that plaintiff requested a
hearing prior to November 2002.[12] Perhaps plaintiff's position
is that defendant was at fault for failing to issue a written
notice of termination advising him of his right to a hearing or
that the University was making it clear that it did not believe
he was entitled to a hearing and therefore would not have
provided one even if requested. Plaintiff, however, does not
spell out such an argument nor does he provide any evidence of a
refusal on the University's part. However, there is also a
burden on defendant to show a justification for the delay.
Defendant does not attempt to provide either a factual or legal
argument justifying the delay. All defendant does is cite to De
Vito and assert that a two-year delay is not automatically a
constitutional violation. On the facts and arguments before the
court, it cannot be determined whether the delay was justified.

But even assuming plaintiff was entitled to a
posttermination hearing and that the delay did not comport

---

[12]The present lawsuit was not filed until December 19,
2001, over 16 months after plaintiff's residency had been
terminated. The complaint requested reinstatement as relief, not
a hearing. Plaintiff does not present any evidence that he
requested a hearing between the time the suit was filed and when
the University provided written notice of the termination.
Defendant also presents no evidence regarding what happened
during this time period.

with due process requirements, plaintiff still has not shown entitlement to relief. Plaintiff was provided with a hearing which upheld his dismissal and there is no evidence that the result would have been any different had a more timely hearing been provided. There is also no evidence that plaintiff suffered any emotional injury as a result of the delay. Therefore, plaintiff would not be entitled to official capacity injunctive relief reinstating plaintiff. See Patterson v. Portch, 853 F.2d 1399, 1407-08 (7th Cir. 1988); Fenje II, 2002 WL 1160158 at *3. Neither would plaintiff be entitled to any injunctive relief prohibiting future delays in providing hearings since plaintiff has already received his hearing and is no longer a resident at risk of being dismissed, so he does not having standing to seek such relief. See generally City of Los Angeles v. Lyons, 461 U.S. 95 (1983).[13] Any damages relief can only be awarded as against defendant in his individual capacity. While there is evidence that Feld was the de facto director of the residency

_____

[13]Plaintiff also contends the hearing procedure set forth in Exhibit B is facially unconstitutional in that it contains no express provision as to when a hearing must be held. Feld was not personally responsible for the terms contained in Exhibit B. Any claim for deficiencies in Exhibit B would only go against defendant in his official capacity. For the same reasons stated in the text, plaintiff would not be entitled to reinstatement and would lack standing for any other form of official capacity relief. Also, it is not a constitutional violation to fail to have an express written provision as to when a hearing must be held. See De Vito, 972 F.2d at 857. A facial deficiency might occur only if there was an express provision mandating that a resident had to wait a specified and unreasonable period of time before a hearing could take place.

program, there is no evidence that he would be the one responsible for providing the hearing. Paragraph A of Exhibit B provides that the request for a hearing is submitted to the "Department Head," which would be Albrecht as the Director of the Anesthesiology Department. Albrecht would have also been responsible for issuing the written notice of termination. Any unconstitutional delay in providing a hearing cannot be attributed to Feld in his individual capacity. Therefore, no damages can be awarded related to any delay.[14]

In sum, plaintiff's claim for a denial of a prompt posttermination hearing fails because plaintiff was not entitled to any posttermination hearing. Alternatively, such a claim fails because he was provided with an adequate hearing and, even if such a hearing was unconstitutionally delayed, plaintiff was not harmed by the delay and therefore can obtain no relief for the delay that occurred.

Counts Two, Three, and Four will be dismissed.

### C. Stigma

Plaintiff contends he was deprived of a liberty interest in that he was stigmatized in being discharged on grounds of dishonesty. A liberty interest may be threatened when a public employee is discharged under circumstances where "the

---

[14]Also, plaintiff has not shown he suffered any emotional injury caused by the delay, though that could still leave the possibility of nominal damages, see Alston, 231 F.3d at 386; Fenje II, 2002 WL 1160158 at *3, if there were a defendant against whom such damages could be awarded.

individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts." Townsend v. Vallas, 256 F.3d 661, 669 (7th Cir. 2001) (quoting Munson v. Friske, 754 F.2d 683, 693 (7th Cir. 1985)). In order to make a claim of unconstitutional stigmatization, "the employee must show that (1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." Townsend, 256 F.3d at 669-70. "The first element requires the employee to show that a public official made defamatory statements about him." Strasburger v. Board of Education, Hardin County Community Unit School District No. 1, 143 F.3d 351, 356 (7th Cir. 1998), cert. denied, 525 U.S. 1069 (1999). The statement must be shown to be factual in nature, to be false, to have come from the mouth of a public official. Id. To satisfy the third element, it must be shown that some employment opportunity was actually denied because of the disparaging statement. Townsend, 256 F.3d at 670.

Plaintiff cannot satisfy any of these elements. It is undisputed that plaintiff worked a short period of time at Ayr Hospital and that he did not disclose that information during the application process. Thus, he has not shown that the grounds for the termination of his residency were false. There also is no evidence that Feld or any other University employee publicly disclosed that plaintiff was discharged because of dishonesty. A

discharge, even if it affects further employment opportunities, does not by itself satisfy the first element.  Ratliff v. City of Milwaukee, 795 F.2d 612, 625 (7th Cir. 1986).  Additionally, plaintiff has not shown that he was actually foreclosed from any employment opportunity as a result of the discharge.  Contrary to plaintiff's contention, he must show an actual denial of an employment opportunity caused by the stigmatization.  Townsend, 256 F.3d at 670.  Moreover, plaintiff was subsequently provided with a hearing that upheld his discharge on grounds of dishonesty.  Therefore, even if he can show public disclosure of the stigmatization that affected an employment opportunity, he cannot contend that it was without due process.  As discussed in § II(B)(3) supra, the hearing that was provided was adequate.  And even if there was delay, that is immaterial since the grounds for the termination were upheld.  There is no evidence that an earlier hearing would have instead resulted in his name being cleared.

Count Five will be dismissed.

### D. Class of One

An equal protection claim based on a "class of one" may be brought "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  To make out such a claim, it must be shown that the defendant acted with vindictiveness, ill will, or some other

similarly malevolent animus.  <u>Discovery House, Inc. v.</u>
<u>Consolidated City of Indianapolis</u>, 319 F.3d 277, 283 (7th Cir.),
<u>cert. denied</u>, 124 S. Ct. 301 (2003); <u>Nevel v. Village of</u>
<u>Schaumburg</u>, 297 F.3d 673, 681 (7th Cir. 2002); <u>Hilton v. City of</u>
<u>Wheeling</u>, 209 F.3d 1005, 1008 (7th Cir. 2000), <u>cert. denied</u>, 531
U.S. 1080 (2001); <u>Fenje I</u>, 2002 WL 959837 at *7.  Moreover,
"[i]ll will must be the sole cause of the complained-of action."
<u>Nevel</u>, 297 F.3d at 681 (quoting <u>Albiero v. City of Kankakee</u>,
246 F.3d 927, 932 (7th Cir. 2001)).

Defendant contends this claim fails because there is no
evidence of vindictiveness or another similar animus.  Plaintiff
only points to evidence that Feld terminated the residency
because of plaintiff's lack of candor and that defendant intended
to do so.  That is not evidence of vindictiveness or ill will of
any sort.  Count Six will be dismissed.

### E. Tortious Interference

Count Seven is a state law claim that defendant, in his
individual capacity, tortiously interfered with plaintiff's
contract with the University.  Although plaintiff alleges in the
complaint that Count Seven is before the court based on
supplemental jurisdiction, <u>see</u> 28 U.S.C. § 1367(a), it appears
that diversity jurisdiction would ordinarily support that count.
<u>See</u> 28 U.S.C. § 1332(a)(2).  Plaintiff is alleged to be a citizen
of Canada, he states in his affidavit that he currently resides
in Canada, and it has been represented throughout this litigation
that he resides in Canada.  There is no indication that plaintiff

was a permanent resident residing in Illinois or some other state
at the time this lawsuit was filed. There is nothing to indicate
that Feld is not a United States citizen or permanent resident
residing in Illinois or a nearby state. The Second Amended
Complaint does not allege a specific amount of damages, but
plaintiff has indicated that he is seeking $20,000,000 in damages
for his claims. It appears that complete diversity of
citizenship and the jurisdictional amount requirement are
satisfied as to Count Seven. Therefore, although all the federal
claims are being dismissed, a basis still could exist for
considering Count Seven.

Defendant, however, contends that jurisdiction is lacking
for another reason. Defendant contends jurisdiction over Count
Seven is exclusively in the Illinois Court of Claims because,
although he is being sued in his individual capacity, defendant's
relationship with plaintiff exists solely because of defendant's
employment with the University. If jurisdiction over this claim
is exclusively in the Illinois Court of Claims, this court lacks
jurisdiction to consider the claim. Turner v. Miller, 301 F.3d
599, 602-03 (7th Cir. 2002); Feldman v. Ho, 171 F.3d 494, 498
(7th Cir.), cert. denied, 528 U.S. 928 (1999).

> . . . [T]he prohibition "against making the
> State of Illinois a party to a suit cannot be
> evaded by making an action nominally one against
> the servants or agents of the State when the real
> claim is against the State of Illinois itself and
> when the State of Illinois is the party vitally
> interested." (Sass v. Kramer (1978), 72 Ill. 2d
> 485, 491, 21 Ill. Dec. 528, 381 N.E.2d 975.)
> Sovereign immunity affords no protection,

however, when it is alleged that the State's
agent acted in violation of statutory or
constitutional law or in excess of his authority,
and in those instances an action may be brought
in circuit court.
. . . [W]hen "there are (1) no allegations
that an agent or employee of the State acted
beyond the scope of his authority through
wrongful acts; (2) the duty alleged to have been
breached was not owed to the public generally
independent of the fact of State employment; and
(3) where the complained-of actions involve
matters ordinarily within that employee's normal
and official functions of the State, then the
cause of action is only nominally against the
employee." ([Robb v. Sutton, (1986)] 147 Ill.
App. 3d [710,] 716, 101 Ill. Dec. 85, 498 N.E.2d
267.)  In those circumstances, the action is one
against the State and must, therefore, be brought
in the Court of Claims.

Healy v. Vaupel, 133 Ill. 2d 295, 549 N.E.2d 1240, 1247 (1990).

Here, it is alleged in the tortious interference count

that "Defendant Feld's actions were based on ill will, an

illegitimate animus, 'personal reasons,' retribution or spite,

and/or were an effort to unlawfully punish the Plaintiff, they

were unjustified, illegal and were intended to harm and damage

the Plaintiff without right or justifiable cause."  2d Am. Compl.

¶ 44.

Claims of tortious interference with contract made

against a state employee generally will fall within the

jurisdiction of the Illinois Court of Claims.  See, e.g.,

Feldman, 171 F.3d at 498; Welch v. Illinois Supreme Court, 322

Ill. App. 3d 345, 751 N.E.2d 1187, 1194 (3d Dist. 2001);

Wozniak v. Conry, 288 Ill. App. 3d 129, 679 N.E.2d 1255, 1257-59

(4th Dist.), appeal denied, 174 Ill. 2d 597, 686 N.E.2d 1174

(1997); <u>Management Association of Illinois, Inc. v. Board of</u> <u>Regents of Northern Illinois University</u>, 248 Ill. App. 3d 599, 618 N.E.2d 694, 704-06 (1st Dist. 1993); <u>Sarpolis v. Board of</u> <u>Trustees of University of Ill.</u>, 52 Ill. Ct. Cl. 390 (2000). <u>But compare</u> <u>Boloun v. Williams</u>, 2002 WL 31426647 *13 (N.D. Ill. Oct. 25, 2002). Plaintiff's allegations do not take the tortious interference claim outside the general rule. This court lacks jurisdiction to consider Count Seven. Count Seven will be dismissed without prejudice for lack of subject matter jurisdiction.

## III. CONCLUSION

For the reasons set forth above, defendant is entitled to summary judgment dismissing plaintiff's cause of action with prejudice except that the state law tortious interference claim will be dismissed without prejudice for lack of subject matter jurisdiction. Since undisputed facts support that defendant is entitled to summary judgment, it is unnecessary to separately address plaintiff's summary judgment motion which will be denied.[15] Since plaintiff's cause of action is now being dismissed, the preliminary injunction that was previously granted will be dissolved.

IT IS THEREFORE ORDERED that plaintiff's motion to strike defendant's Local Rule 56.1(a)(3) statement of material facts

---

[15]Where Pl. 56.1(b)(3)(A) or plaintiff's brief in opposition to summary judgment cited to plaintiff's Local Rule 56.1(a)(3) statement filed with his own summary judgment motion, plaintiff's summary judgment submission was considered.

[95] is denied. Defendant's motion for leave to file response [118] is granted. Plaintiff's second objections to defendant's evidence and motion to strike the same [108] is granted in part and denied in part. Defendant's motion to strike is granted in part and denied in part. Defendant's motion for summary judgment [90] is granted. Plaintiff's motion for summary judgment [97] is denied. The preliminary injunction entered on May 29, 2002 is dissolved. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff dismissing plaintiff's cause of action with prejudice except that the Count Seven tortious interference claim is dismissed without prejudice for lack of subject matter jurisdiction.

ENTER:

*William T. Hart*

UNITED STATES DISTRICT JUDGE

DATED: DECEMBER 8 , 2003

## A. Objection 1

Plaintiff objects that certain documents have not been specifically authenticated by an affidavit, including application documents he purportedly submitted to the University, letters or e-mails purportedly sent by plaintiff, and records of the University.

It is true that documents submitted in support of a summary judgment motion must be authenticated in order to be admissible. Scott v. Edinburg, 346 F.3d 752, 759-60 & n.7 (7th Cir. 2003). Authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). This includes "[t]estimony that a matter is what it is claimed to be." Id. 901(b)(1). Documents produced by an opponent during discovery may be treated as authentic. International Paper Co. v. Androscoggin Energy LLC, 2002 WL 31155069 *2 (N.D. Ill. Sept. 26, 2002); Spears v. Delphi Automotive Systems Corp., 2002 WL 1880756 *6-7 (S.D. Ind. Aug. 15, 2002). Where authenticated documents containing a person's signature are in the record, the finder of fact may determine whether other documents contain an authentic signature. Fed. R. Evid. 901(b)(3); United States v. Papia, 910 F.2d 1357, 1366 (7th Cir. 1990); United States v. Spano, 2002 WL 31557624 *4 (N.D. Ill. Nov. 18, 2002); Electronics Boutique Holdings Corp. v. Zuccarini, 2001 WL 83388 *5 n.7 (E.D. Pa. Jan. 25, 2001), aff'd by unpublished order, 33 Fed. Appx.

# APPENDIX

647, 2002 WL 917789 (3d Cir. April 25, 2002). E-mail
communications may be authenticated as being from the purported
author based on an affidavit of the recipient; the e-mail address
from which it originated; comparison of the content to other
evidence; and/or statements or other communications from the
purported author acknowledging the e-mail communication that is
being authenticated. See United States v. Siddiqui, 235 F.3d
1318, 1322-23 (11th Cir. 2000), cert. denied, 533 U.S. 940
(2001); B.S. ex rel. Schneider v. Board of School Trustees,
Fort Wayne Community Schools, 255 F. Supp. 2d 891, 893-94 (N.D.
Ind. 2003); Uncle Henry's Inc. v. Plaut Consulting Inc., 240
F. Supp. 2d 63, 71-72 (D. Me. 2003).

     Rule 56 provides in part that "papers or parts thereof
referred to in an affidavit shall be attached thereto or served
therewith." Fed. R. Civ. P. 56(e) (emphasis added). Plaintiff
may be objecting that papers referred to in particular affidavits
are not attached thereto. Documents cited in a particular
affidavit are not separately attached to each affidavit.
However, defendant's Appendix of Exhibits [92] binds together all
the affidavits and all the documentary evidence relied upon.
This certainly satisfies the "served therewith" alternative if
not the "attached thereto" alternative as well. No document
lacks a proper foundation for not being attached to an affidavit.

     Defendant Exhibit L-46 is represented to be plaintiff's
application for the residency program. In Pl. 56.1(b)(3)(A),
plaintiff repeatedly admits that he submitted an application but

denies that Def. Exh. L-46 is an accurate copy of the application. The objections generally do not identify the purported inaccuracy and plaintiff does not point to any deposition testimony or affidavit supporting the document is inaccurate. Defendant provides the affidavit of the Administrator of the Department of Anesthesiology (Mickey Leavy) who identifies herself as the Department's keeper of records. She authenticates the application as does defendant. Plaintiff does not create any genuine factual dispute that Def. Exh. L-46 is not authentic.

Defendant submits four letters identified as letters from plaintiff, one addressed to defendant (L-21), two to Leavy (L-26, L-29), and one to Dr. Ronald Albrecht (L-25). Plaintiff apparently denies the authenticity of these letters. However, plaintiff points to no deposition testimony or affidavit denying he authored and sent these letters. Each of the recipients identifies the respective letters as an accurate copy of a letter he or she received from plaintiff. Feld Aff. ¶ 15; Leavy Aff. ¶ 8; Albrecht Aff. ¶ 9. Additionally, a reasonable finder of fact could only find that the signature of plaintiff matches other authentic signatures contained in the record, e.g., the signature on his own affidavit. Albrecht also authenticates a letter he sent to plaintiff. See Def. Exh. L-36; Albrecht Aff. ¶ 13. These letters have been adequately authenticated.

Defendant provides two e-mails purported to be from plaintiff to Leavy, one of which is requested to be printed and

provided to defendant.  See Def. Exh. L-3, L-16.  Leavy states in her affidavit that these are accurate copies of e-mails she received from plaintiff.  Leavy Aff. ¶¶ 7, 9.  The printed e-mails show a source e-mail address that matches that shown on plaintiff's letterhead that is included in other authenticated documents.  The contend of the e-mails is consistent with other evidence.  Defendant Exhibits L-3 and L-16 have been adequately authenticated.  Leavy also adequately authenticates an e-mail communication she received and replied to as between herself and another University employee, Denise Hicks-Llorens.  See Def. Exh. L-33; Leavy Aff. ¶ 33.

Defendant Exhibit L-43, plaintiff's license application to the Illinois Department of Professional Regulation ("IDPR") is adequately authenticated by the certification of an IDPR keeper of records.  Fed. R. Evid. 902(1).

The letter from Patricia Leiser to plaintiff (Def. Exh. L-35), the document entitled "Work History--Dr. Paul Fenje, Jr." (Def. Exh. L-37), plaintiff's notice of hearing before a Scottish employment tribunal (Def. Exh. L-47), and plaintiff's Electronic Residency Application Service application (Def. Exh. L-59) are adequately authenticated in that they were produced by plaintiff in discovery.  Exhibit L-37 is further authenticated by the affidavit of Marla Dunning (¶ 2).

The decision following plaintiff's hearing (Def. Exh. L-54) and decision on appeal (Def. Exh. L-81) apparently are not objected to as lacking an adequate foundation.  In any event,

defendant has provided authentication.  See Schwartz Aff. ¶ 3;
Bailie Aff. ¶ 5.

The separately raised objections to plaintiff's
deposition and Def. Exh. L-55 and L-57a are separately discussed
below.

None of the summary judgment exhibits submitted by
defendant will be ignored because lacking adequate foundation or
authentication.  Whether any of the exhibits contains
inadmissible hearsay or other inadmissible content is a distinct
issue that will be addressed separately.

### B. Hearsay Objections (1, 5, 7, 12, 16)

A number of plaintiff's objections include objections of
hearsay.  These will be addressed together.  First, plaintiff
contends that no potentially hearsay evidence may be considered
unless defendant's statement of facts expressly articulates the
basis for admission.  That contention is without merit.  While
the burden is on the proponent of the evidence to make a
sufficient showing that any particular piece of evidence is
admissible, United States v. Robbins, 197 F.3d 829, 838 (7th Cir.
1999); American Automotive Accessories, Inc. v. Fishman, 175 F.3d
534, 540 (7th Cir. 1999), evidentiary objections must first be
raised by the opposing side.  See Zayre Corp. v. S.M. & R. Co.,
882 F.2d 1145, 1150 (7th Cir. 1989); Gorence v. Eagle Food
Centers, 1999 WL 199619 *3 (N.D. Ill. April 1, 1999), aff'd,
242 F.3d 759 (7th Cir. 2001).  There is no rule preventing a
party moving for summary judgment from responding to evidentiary

objections in its reply or even from providing additional foundation materials with the reply. See <u>Elghanmi v. Franklin College of Indiana, Inc.</u>, 2000 WL 1707934 *1 (S.D. Ind. Oct. 2, 2000). The moving party also need not explicitly set forth in its Local Rule 56.1(a)(3) statement the basis (<u>e.g.</u>, a hearsay exception) for each piece of evidence being admissible nor need it anticipate and respond in advance to every possible objection that might be raised to the admissibility of a piece of evidence. No rule contains such a requirement and imposing one would be particularly tedious and greatly expand the length of Local Rule 56.1 statements. Plaintiff misreads <u>Spencer v. Office of Illinois Attorney General</u>, 2002 WL 31898190 *1 (N.D. Ill. Dec. 31, 2002), in contending such a rule exists. That case contains the following: "Furthermore, Exhibit G relies on hearsay, yet Spencer fails to articulate a hearsay exception as mandated by the Rules. <u>See</u> FRE 801-805." That case is saying that it is mandatory to meet one of the exceptions in order to admit hearsay; it is not saying that it is mandatory to articulate the basis for admission in a Local Rule 56.1 statement prior to any objection being raised.

Objections 5, 7, 12, and 16 do not raise any particular hearsay issue. There is no dispute that hearsay that does not meet one of the permissible exceptions may not be considered. It is noted, though, that hearsay is defined as out-of-court statements "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c); <u>United States v. Rettenberger</u>,

344 F.3d 702, 707 (7th Cir. 2003). Out-of-court statements presented for other purposes are not hearsay. Statements intended to show, for example, the speaker's state of mind, EEOC v. University of Chicago Hospitals, 276 F.3d 326, 333 (7th Cir. 2002); Aetna Life Insurance Co. v. Wise, 184 F.3d 660, 665-66 (7th Cir. 1999), offers and negotiations between parties, Hydrite Chemical Co. v. Calumet Lubricants Co., 47 F.3d 887, 892 (7th Cir. 1995), and notices or knowledge of a party, Cook v. Navistar International Transportation Corp., 940 F.2d 207, 213 (7th Cir. 1991); Kemper/Prime Industries Partners v. Montgomery Watson Americas, Inc., 1998 WL 704049 *4 (N.D. Ill. Sept. 30, 1998), are not hearsay. It is not hearsay for defendant or other University officials to state that they made a decision based on information reported to them. While the statements reporting such information generally will be hearsay not admissible to show the truth of the reported information, the statements are not inadmissible hearsay for purposes of showing the information relied upon or considered in making a decision. Schuster v. Shepard Chevrolet, Inc., 2002 WL 507130 *5 (N.D. Ill. April 3, 2002); Teal v. Chicago Sun-Times, Inc., 2001 WL 1609384 *1 n.1 (N.D. Ill. Dec. 14, 2001); Newton v. Chicago School Reform Board of Trustees, 2000 WL 1367612 *6 (N.D. Ill. Sept. 13, 2000). Additionally, plaintiff's own prior statements are admissible nonhearsay as an admission of a party-opponent and may be used as such by defendant. Fed. R. Evid. 801(d)(2). Similarly, prior statements by Feld may be so used by plaintiff, as well as prior

statements of any agents acting on Feld's behalf. This is particularly true in regard to the official capacity claims since most prior statements come from employees of the University.

## C. Objection 2

Plaintiff contends that defendant should be barred from using certain evidence that defendant declined to disclose during discovery. In ruling on a discovery dispute, the court declined to compel further discovery but stated, ". . . if you go to trial and [either of] you have given an inadequate response, if you try to offer evidence that you haven't produced that the other side has asked for, and that side then objects to it, I won't receive it." Jan. 23, 2003[16] Tr. at 6. Plaintiff contends he was denied discovery as to other disciplinary hearings that took place, admissions criteria for applicants, and the files of other applicants. Plaintiff, however, does not point to interrogatories or document requests in which he requested such materials. Although he does not cite to it in support of this objection, plaintiff does provide defendant's response to interrogatories. See Pl. F.R.C.P. 56(e) & LR 56.1(b)(1) [111] Exh. C. The only questions asked about other candidates had specific criteria and defendant responded that no persons fell within those categories. Id. questions 10-12. But, even assuming defendant failed to adequately respond in the manner

_____

[16]The copy of the transcript attached to defendant's Response to Plaintiff's Second Objections is misdated January 23, 2002.

described, defendant does not present any evidence regarding other applicants.

The only evidence defendant presents on this subject is evidence that the criteria for enrollment in the program has changed since the time that plaintiff was first admitted. Plaintiff does not point to a request for such information nor a failure to adequately respond to such a request. In any event, the change in admission criteria is not material to today's decision. Thus any dispute about disclosures related to this subject need not be resolved.

Plaintiff also complains that, had defendant provided applications of other applicants, he could have shown that submissions of other documents were date stamped whereas some of his were not. Plaintiff contends this would show that some of the documents that defendant contends are part of his application really were not. Plaintiff, however, could have made such a showing even without discovery as to other applicants' files. Plaintiff could have provided his own affidavit or declaration attesting to the documents he actually submitted. Also, to the extent his date-stamping theory has credence, he could have shown that some of the documents said to be part of his application were date stamped while others were not.

### D. Objection 3

Plaintiff asserts that "issues of motive or intent are generally inappropriate subjects to be decided on a motion for summary judgment." While it may be true that issues of motive

and intent often cannot be resolved on summary judgment,
Scheib v. Grant, 22 F.3d 149, 155 (7th Cir.), cert. denied, 513
U.S. 929 (1994), "summary judgment will not be defeated simply
because issues of motive or intent are involved." Morgan v.
Harris Trust & Savings Bank, 867 F.2d 1023, 1026 (7th Cir. 1989).
See also Cliff v. Board of School Commissioners of City of
Indianapolis, Ind., 42 F.3d 403, 409 (7th Cir. 1994); Beard v.
Whitley County REMC, 840 F.2d 405, 410 (7th Cir. 1988);
Campbell v. Henderson, 2002 WL 1732361 *4 (N.D. Ill. July 26,
2002), aff'd by unpublished order sub nom., Campbell v. Potter,
57 Fed. Appx. 267, 2003 WL 1120196 (7th Cir. March 11, 2003);
Budgetel Inns v. Micros Systems, 2002 WL 32123532 *22 (E.D. Wis.
Jan. 30, 2002); Treuer v. Shop-Rite, Inc., 35 F. Supp. 2d 678,
681 (E.D. Wis. 1999). There is no basis for excluding evidence
as to motive or intent. Instead, it is a legal question as to
whether the evidence undisputedly establishes any material
factual issues.

### E. Objection 4

As to approximately 70% (according to defendant's count)
of the paragraphs of Def. 56.1(a)(3), plaintiff raises Objection
4 that the supporting evidence is conclusory. It is true that
"[b]are allegations not supported by specific facts are
insufficient in opposing a motion for summary judgment."
Hildebrandt v. Illinois Department of Natural Resources, 347 F.3d
1014, 1036 (7th Cir. 2003) (quoting Schroeder v. Lufthansa German
Airlines, 875 F.2d 613, 620 (7th Cir. 1989)) (emphasis added).

See also Scott, 346 F.3d at 759 n.6.  This rule applies to the
nonmoving party as to factual issues on which he will bear the
burden of proof.  Chapple v. National Starch & Chemical Co. &
Oil, 178 F.3d 501, 504 (7th Cir. 1999) (quoting Chemsource
Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997)).
It generally does not apply to the moving party's initial burden.
As previously stated, the moving party need not provide
affidavits or deposition testimony showing the nonexistence of
essential elements of the nonmoving party's claim.  Celotex, 477
U.S. at 324.  Thus, conclusory evidence as to those issues is
more than sufficient.  It is only as to factual issues on which
defendant bears the burden or otherwise must make an affirmative
showing that he must present non-conclusory evidence.[17]

Additionally, as to certain simple and straightforward
facts, conclusory testimony or affidavit statements will suffice.
For example, to show that he received a letter, it is sufficient
for the affiant to simply state that he or she received an
identified document.  See, e.g., Feld Aff. ¶ 15; Albrecht Aff.
¶ 9.  That is not a statement that must be ignored because
conclusory.  Whether the letter is authentic and was actually
written or sent by the purported author may require additional

_____

[17]To the extent the movant is seeking to overcome
evidence presented by the nonmovant, the movant would need to
present non-conclusory evidence.  In most such situations,
however, that the nonmovant has evidence supporting its position
would mean that a genuine factual dispute exists.  The movant's
evidence would have to be so overwhelming and conclusive as
compared to the nonmovant's evidence that no genuine factual
dispute exists.

See also <u>Scott</u>, 346 F.3d at 759 n.6.  This rule applies to the nonmoving party as to factual issues on which he will bear the burden of proof.  <u>Chapple v. National Starch & Chemical Co. & Oil</u>, 178 F.3d 501, 504 (7th Cir. 1999) (quoting <u>Chemsource Inc. v. Hub Group, Inc.</u>, 106 F.3d 1358, 1361 (7th Cir. 1997)).  It generally does not apply to the moving party's initial burden.  As previously stated, the moving party need not provide affidavits or deposition testimony showing the nonexistence of essential elements of the nonmoving party's claim.  <u>Celotex</u>, 477 U.S. at 324.  Thus, conclusory evidence as to those issues is more than sufficient.  It is only as to factual issues on which defendant bears the burden or otherwise must make an affirmative showing that he must present non-conclusory evidence.[17]

Additionally, as to certain simple and straightforward facts, conclusory testimony or affidavit statements will suffice.  For example, to show that he received a letter, it is sufficient for the affiant to simply state that he or she received an identified document.  <u>See, e.g.</u>, Feld Aff. ¶ 15; Albrecht Aff. ¶ 9.  That is not a statement that must be ignored because conclusory.  Whether the letter is authentic and was actually written or sent by the purported author may require additional

_____

[17]To the extent the movant is seeking to overcome evidence presented by the nonmovant, the movant would need to present non-conclusory evidence.  In most such situations, however, that the nonmovant has evidence supporting its position would mean that a genuine factual dispute exists.  The movant's evidence would have to be so overwhelming and conclusive as compared to the nonmovant's evidence that no genuine factual dispute exists.

proof, but that does not preclude crediting the statement that the identified exhibit was received. As was previously discussed, _see_ App. § A _supra_, there is adequate proof as to the authenticity of the letters included among defendant's exhibits.

### F. Objection 6

Objection 6 is that statements in certain affidavits are not supported by a proper foundation. The nature of this objection is not clear. Plaintiff cites <u>Swift Brothers v. Swift Sons, Inc.</u>, 921 F. Supp. 267 (E.D. Pa. 1995), in support of this contention, without any specific page citation. That case, however, contains no holding as to foundation. It does have a holding concerning hearsay. <u>See</u> <u>id.</u> at 277. In any event, it will be considered whether an adequate foundation exists for statements or documents referenced in an affidavit or testimony.

### G. Objection 8

Plaintiff contends it is improper to "assert legal and <u>other conclusions</u> in a statement of material facts." It is true that legal conclusions should not be contained in a Rule 56.1 statement. <u>See</u> <u>Malec v. Sanford</u>, 191 F.R.D. 581, 583 (N.D. Ill. 2000). However, a witness may testify to conclusions he or she infers from the underlying facts. <u>See</u> Fed. R. Evid. 701, 704(a). A summary judgment affidavit may include inferences and opinions as long as they are based on underlying facts of which the affiant has personal knowledge. <u>Payne v. Pauley</u>, 337 F.3d 767, 772 (7th Cir. 2003); <u>Drake v. Minnesota Mining & Manufacturing Co.</u>, 134 F.3d 878, 887 (7th Cir. 1998). And the Rule 56.1

proof, but that does not preclude crediting the statement that the identified exhibit was received. As was previously discussed, see App. § A supra, there is adequate proof as to the authenticity of the letters included among defendant's exhibits.

### F. Objection 6

Objection 6 is that statements in certain affidavits are not supported by a proper foundation. The nature of this objection is not clear. Plaintiff cites Swift Brothers v. Swift Sons, Inc., 921 F. Supp. 267 (E.D. Pa. 1995), in support of this contention, without any specific page citation. That case, however, contains no holding as to foundation. It does have a holding concerning hearsay. See id. at 277. In any event, it will be considered whether an adequate foundation exists for statements or documents referenced in an affidavit or testimony.

### G. Objection 8

Plaintiff contends it is improper to "assert legal and other conclusions in a statement of material facts." It is true that legal conclusions should not be contained in a Rule 56.1 statement. See Malec v. Sanford, 191 F.R.D. 581, 583 (N.D. Ill. 2000). However, a witness may testify to conclusions he or she infers from the underlying facts. See Fed. R. Evid. 701, 704(a). A summary judgment affidavit may include inferences and opinions as long as they are based on underlying facts of which the affiant has personal knowledge. Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003); Drake v. Minnesota Mining & Manufacturing Co., 134 F.3d 878, 887 (7th Cir. 1998). And the Rule 56.1

statement itself certainly may include the ultimate factual
determinations to be made by the trier of fact. Those
statements, though, must be sufficiently supported by the cited
evidence or related evidence upon which it relies.

In any event, it is a factual statement, not a legal
conclusion, that a person decided to withdraw an offer. See Def.
56.1(a)(3) ¶¶ 29, 34. Cf. Taylor v. Canteen Corp., 69 F.3d 773,
784 (7th Cir. 1995) (factual issues as to whether contract offer
was accepted); R & B Group, Inc. v. BCI Burke Co., 982 F. Supp.
549, 555 (N.D. Ill. 1997). The legal effect of such action
is the legal issue. It is also a factual statement when a
person states his reasons for taking a particular action. See
Def. 56.1(a)(3) ¶¶ 32-34. Cf. Eastridge v. Rhode Island College,
996 F. Supp. 161, 167 (D.R.I. 1998).

### H. Objection 9

Plaintiff objects to certain statements in affidavits as
being self-serving without adequate factual support. Seventh
Circuit case law supports "the proposition that self-serving,
uncorroborated, and conclusory statements in testimony are
insufficient to defeat a motion for summary judgment." Payne,
337 F.3d at 773 (collecting cases). "It is not the self-serving
nature of the affidavits, however, that sealed their fate in
these cases. After all, most affidavits submitted for these
purposes are self-serving." Id. Instead, the affidavits failed
to defeat summary judgment because they were not based on
personal knowledge, contained speculative conclusions, or were

conclusory. _Id._ at 772-73. Characterizing the evidentiary support as self-serving adds nothing to the objection. The evidentiary support will only be found to be deficient to the extent it is not based on personal knowledge or lacks support for the underlying facts, see App. § G _supra_, or because it is improperly conclusory, see App. § E _supra_.

### I. Objection 10

Plaintiff objects that some of the affidavits submitted by defendant are from witnesses who were not disclosed by defendant in response to discovery requests. Plaintiff objects to the affidavits of Dunning, Jose Salazar, Dorothy Mordan, David Schwartz, and Michael Bailie.

Federal Rule of Civil Procedure Rule 37(c)(1) provides in part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Schwartz presided at plaintiff's March 2003 hearing and Bailie decided the appeal of the hearing panel's decision. Neither were known witnesses at the time defendant provided his amended interrogatory answers in January 2003. Since plaintiff was well aware of Schwartz's and Bailie's roles and their

potential as witnesses, defendant was not obliged to supplement his interrogatory answers to identify them as witnesses and therefore there was no violation of Rule 26(e) that would support barring use of these two witnesses. Everst v. Credit Protection Association, L.P., 2003 WL 22048719 *1 n.1 (N.D. Ill. Aug. 25, 2003). In any event, plaintiff was not harmed in any way by the failure to disclose these potential witnesses. The affidavits of Schwartz and Bailie will be considered.

Salazar tape recorded the March 2003 hearing and his affidavit establishes that these tapes were provided to the Office of the University Counsel. Mordan is an employee of the University's Bureau of Office Services. She received the tapes from the University Counsel and verifies that the transcripts accurately reflect the content of the tapes. Defendant contends these two did not have to be identified in response to Interrogatory No. 2 because they only authenticate an exhibit, they do not provide testimony as to facts themselves. Even if they should have been identified in a supplemental response to this interrogatory, there is no contention by plaintiff that the transcript of the hearing is inaccurate and plaintiff does not point to what could have been gained had these witnesses been identified. Feld and Albrecht also state in their affidavits that the transcript is accurate. Since plaintiff has not been prejudiced, the affidavits of Salazar and Mordan will be considered.

Dunning (f/k/a Klikunas) is the Information Services
Officer/Licensing Specialist with the University's Office of
Graduate Medical Education. She provides information regarding
procedures for obtaining medical licenses and the attempt to
obtain a medical license for plaintiff. She also states that
Feld did not inform her in August 2000 that he had withdrawn
the offer to plaintiff. Additionally, Dunning provides
authentication for two exhibits (L-37, L-43), for which other
means of authentication is also provided. Defendant contends he
adequately disclosed Dunning in response to Interrogatory No. 2.
The only reference to Dunning contained therein is a reference to
a July 20, 2000 e-mail from "Kikunas (sic)" to plaintiff.[18] The
subject of the e-mail is problems with plaintiff's Illinois
medical license application. This was sufficient notice to
plaintiff that Dunning (Klikunas) was a potential witness as to
the subjects on which she presently provides affidavit testimony.
Cf. Ecoco, Inc. v. Universal Beauty Products, Inc., 1998 WL
887072 *2 (N.D. Ill. Dec. 11, 1998). Alternatively, even if the
disclosure was deficient in not specifically reciting Dunning's
potential testimony, plaintiff was not harmed. Plaintiff had
sufficient notice and awareness of Dunning's role such that he
had adequate information on which to decide whether or not to

_____

[18]A copy of this e-mail is provided with Def. 56.1(a)(3)
Reply [117]. It is attached to and authenticated by Dunning's
supplemental affidavit and labeled as Def. Exh. 13.

depose her. Plaintiff provides no specific argument to the
contrary.[19] Dunning's affidavits will be considered.

## J. Objection 11

Plaintiff objects to statements in affidavits based on
what a person "heard," "felt," or "thinks." The quoted words do
not actually appear in the affidavit statements to which
plaintiff objects. This objection is just a variation on
plaintiff's state of mind and hearsay objections. Such
objections are generally without merit. See App. § B supra. A
witness may testify as to his or her own state of mind. As to
other persons, the witness generally may only testify as to
another person's statements or conduct (to the extent not
inadmissible hearsay), but not as to the other person's actual
state of mind.

## K. Objection 12

Issues of hearsay, App. § B supra; personal knowledge and
conclusory statements, App. § G supra; and foundation and
authentication, App. § A supra, have already been addressed.

## L. Objections 13 & 20

Plaintiff objects to the use of the transcript created
from the audio tape of the March 2003 hearing. He objects that

_____

[19]Objection 10 itself does not mention specific witnesses
and only provides a citation to defendant's amended interrogatory
responses as a whole. No other background information is
provided. That plaintiff is objecting to Dunning can only be
determined because 10 is one of a string of objections listed in
Pl. 56.1(b)(3)(A) in response to each paragraph for which
defendant cites to Dunning's affidavit.

depose her.  Plaintiff provides no specific argument to the contrary.[19]  Dunning's affidavits will be considered.

### J. Objection 11

Plaintiff objects to statements in affidavits based on what a person "heard," "felt," or "thinks."  The quoted words do not actually appear in the affidavit statements to which plaintiff objects.  This objection is just a variation on plaintiff's state of mind and hearsay objections.  Such objections are generally without merit.  See App. § B supra.  A witness may testify as to his or her own state of mind.  As to other persons, the witness generally may only testify as to another person's statements or conduct (to the extent not inadmissible hearsay), but not as to the other person's actual state of mind.

### K. Objection 12

Issues of hearsay, App. § B supra; personal knowledge and conclusory statements, App. § G supra; and foundation and authentication, App. § A supra, have already been addressed.

### L. Objections 13 & 20

Plaintiff objects to the use of the transcript created from the audio tape of the March 2003 hearing.  He objects that

---

[19]Objection 10 itself does not mention specific witnesses and only provides a citation to defendant's amended interrogatory responses as a whole.  No other background information is provided.  That plaintiff is objecting to Dunning can only be determined because 10 is one of a string of objections listed in Pl. 56.1(b)(3)(A) in response to each paragraph for which defendant cites to Dunning's affidavit.

an adequate foundation has not been laid.  However, an adequate

foundation has been provided.  See Salazar Aff. ¶¶ 1-3; Mordan

Aff. ¶ 2; Feld Aff. ¶ 18; Schwartz Aff. ¶ 3.

Plaintiff also objects that the transcript should not be

considered because he was informed that any proceedings were not

transcribed or recorded, he was not aware the recording occurred,

and he never consented to such a recording.  Contrary to

plaintiff's contention, he was not told that the hearing would

not be recorded.  The December 13, 2002 letter from Donna

Williamson upon which he relies instead states in response to his

written question:  "8. Will the proceedings be transcribed or

recorded?  The procedures do not provide for that, but the

Committee could decide to do so."  The three hearing panel

members and Salazar all provide affidavits supporting that

microphones, the recording device, and Salazar were in plain view

during the hearing, that any person in attendance could see a

recording was being made, and that nobody objected to the

recording.  The first sentence of the transcript is Schwartz

stating: "Jose [Salazar], we're going to go on."  At one point

the hearing was interrupted and plaintiff was advised that his

attorney wanted to speak to him.  Following that interruption,

Schwartz stated:  "Jose, we're off.  Okay, we're going to go back

on.  Dr. Fenje, could you continue, please."  At the conclusion

of the hearing, Schwartz stated:  "Thank you.  We're off the

record."  Plaintiff's conclusory statement in his affidavit that

he was unaware a recording was being made is insufficient to

overcome the evidence to the contrary. There is no contention or evidence that plaintiff expressly consented to the recording, but he has not provided sufficient evidence to support a genuine factual dispute as to whether or not he was aware the recording was occurring. On defendant's summary judgment motion, it must be taken as true that plaintiff was aware the hearing was being recorded.

In any event, even if plaintiff was unaware a recording was being made and did not consent to it, he makes no legal argument as to why that is a basis for excluding the recording from evidence. Even recorded conversations that violate state law are admissible in federal proceedings, at least in regard to federal claims, if the recordings comport with the federal requirement that one party consent. United States v. D'Antoni, 874 F.2d 1214, 1218-19 (7th Cir. 1989); United States v. Goodapple, 958 F.2d 1402, 1410 n.3 (7th Cir. 1992); United States v. Teller, 412 F.2d 374, 377 (7th Cir. 1969), cert. denied, 402 U.S. 949 (1971); Glinski v. City of Chicago, 2002 WL 113884 *4 (N.D. Ill. Jan. 29, 2002); Johnson v. Around The Clock Security, Inc., 2002 WL 472269 (N.D. Ill. March 28, 2002). But see G.M. Harston Construction Co. v. City of Chicago, 209 F. Supp. 2d 902, 906 (N.D. Ill. 2002); Mingo v. Roadway Express, Inc., 135 F. Supp. 2d 884, 891-92 (N.D. Ill. 2001). Glinski, 2002 WL 113884 at *5-7, holds that violation of Illinois's Eavesdropping Act precludes use of such evidence in support of state law claims.

Even assuming the transcript of the hearing is relevant to the Count Seven tortious interference claim, plaintiff has not shown that a genuine factual dispute exists as to whether a violation of the Illinois Eavesdropping Act occurred, nor has plaintiff made a sufficient legal argument in support of such a contention. As to supporting facts, plaintiff has not shown that facts exist which do not constitute implied consent through acquiescence to conversations knowingly being recorded. See People v. Ceja, 204 Ill. 2d 332, 789 N.E.2d 1228, 1241 (2003). As to any legal argument, plaintiff has made none.

Additionally, even if the recording itself were not admissible,[20] Feld was present at the hearing and states in his affidavit that the transcript is accurate. Therefore, for purposes of summary judgment, the transcript shows facts for which Feld could provide testimony at trial, that is, Feld could provide testimony as to what occurred at the hearing and who said what. Cf. Jessup v. National R.R. Passenger Corp., 2002 WL 507124 *1 n.2 (N.D. Ill. April 3, 2002) (affidavit may properly incorporate content of hearing transcript if affiant could testify to the content based on personal knowledge). Plaintiff provides no contrary evidence that the statements made at the

_____

[20]At a trial, the recording, not the transcript would be the admissible evidence. Unless the parties stipulated to its accuracy and admission, the transcript would only be provided as an aid in listening to the tape recording. See United States v. Jordan, 223 F.3d 676, 688-90 (7th Cir. 2000); United States v. Singleton, 125 F.3d 1097, 1104-05 (7th Cir. 1997), cert. denied, 522 U.S. 1098 (1998); 7th Cir. Crim. Jury Instr. 3.17.

hearing were other than as reflected in the transcript. There is no genuine factual dispute as to what occurred at the hearing.

To the extent plaintiff is contending that statements made at the hearing are inadmissible hearsay, that contention is also without merit. The entire hearing can be considered as evidence of procedures that were provided to plaintiff and information that was before the hearing panel in making its decision. Id.; App. § B supra. See also Scherer v. Rockwell International Corp., 975 F.2d 356, 358 n.2 (7th Cir. 1992) (dictum). That would not be hearsay since the statements would not be being used to show the truth of the matter contained therein. Additionally, plaintiff's statements at the hearing are nonhearsay admissions that defendant may present as evidence, just as plaintiff may use statements Feld (and possibly others) made at the hearing. See App. § B supra.

The transcript of the March 2003 hearing may properly be considered on summary judgment.

### M. Objection 14

Plaintiff contends the portions of his deposition that have been presented may not be used because not properly certified. See Fed. R. Civ. P. 30(f), 56(e); Pfeil v. Rogers, 757 F.2d 850, 859-60 (7th Cir. 1985), cert. denied, 475 U.S. 1107 (1986). The transcript excerpts that are provided, however, contain the title page showing the title of this case and that plaintiff is the deponent and the reporter's certification is

also provided.  See Fenje Dep. at 1, 90-92, 282-84, 353-54, 356, 392.  The deposition excerpts will be considered.

### N. Objection 15

Plaintiff objects that certain paragraphs of Def. 56.1(a)(3) contain improper characterizations in that they assert opinions and argumentative characterizations.  Most of the objected to paragraphs contain statements as to state of mind or causation.  If supported by the cited exhibits, such statements are proper factual statements.  In any event, the court will only credit adequately supported facts.

### O. Objection 17

Plaintiff contends some of defendant's citations to the record are not specific enough.[21]  These objections are generally without any merit whatsoever.  This objection is sometimes included when specific paragraphs of an affidavit are cited.  It is also frequently used when defendant cites a page of a deposition.  Such a citation is sufficient; the party need not cite exact lines of a deposition.  Defendant has some citations to multiple pages of a deposition, but that is because the pertinent testimony (sometimes interspersed with objections of plaintiff's counsel or lengthened by evasive answers of plaintiff) is of that length.  No citation in any of defendant's Local Rule 56.1 statements has been found to be so lacking in

---

[21]Such objection is ironic coming from a party that often cites lengthy cases without specific page citations.

specificity that the pertinent portion of the record cannot be located.

**P. Objection 18**

Plaintiff objects to three paragraphs of Def. 56.1(a)(3) as being immaterial. Objecting to materiality does not deny a fact. If that were the only objection, the fact would be deemed admitted, L.R. 56.1(b)(3)(B); <u>Richter v. Village of Oak Brook</u>, 2003 WL 22169763 *4 nn.14,16 (N.D. Ill. Sept. 19, 2003), though its materiality would still be a legal issue going to the merits of the summary judgment motion. To the extent any of the objected to paragraphs contain immaterial facts, those facts will either not be mentioned at all in reciting the facts assumed to be true for purposes of summary judgment or their consideration will not affect the outcome. One of the paragraphs though, Def. 56.1(a)(3) ¶ 35, clearly contains immaterial facts. That plaintiff testified at his deposition that he was unaware of any motive for Feld's actions other than those Feld has stated is not material. To the extent Feld's motive is a material issue for summary judgment, plaintiff's perceptions as to that motive as of the time of his deposition do not matter. All that would matter is whether defendant, through counsel, presently presents evidence raising a genuine factual dispute as to Feld's motive.

**Q. Objection 19**

Plaintiff contends that some of the paragraphs in Def. 56.1(a)(3) contain multiple assertions in violation of L.R. 56.1(a)'s requirement of "short" paragraphs. At least one case

from this district has construed "short" to mean the paragraph should contain "only one or two individual allegations." Malec, 191 F.R.D. at 583. There is no present need to precisely quantify what is meant by "short." None of the objected to paragraphs can be characterized as either long or complex. They are all short, simple, and clear enough to be readily amenable to response. No factual assertion of defendant will be ignored because contained in a too lengthy or complex paragraph. Compare Graney v. Hartford Financial Services, Inc., 2002 WL 31248509 *2 (N.D. Ill. Oct. 4, 2002).